**GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

v.

**FIRST JERSEY NATIONAL BANK, et al.**

Civ. A. No. 83–3223.

United States District Court, E.D. Pennsylvania.

Oct. 25, 1984.

Kean K. McDonald, LaBrum & Doak, Philadelphia, Pa., for plaintiff.

Ian A.L. Strogatz, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendant.

Miles H. Shore, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for First Pennsylvania Bank, N.A.

John T. Curtin, Philips, Curtin & DiGiacomo, Philadelphia, Pa., for Hudson United Bank.

John P. Kopesky, Philadelphia, Pa., for First Jersey Nat. Bank.

Gordon Gelfond, Philadelphia, Pa., for Ramapo Bank.

Hiliary H. Holloway, Philadelphia, Pa., for Federal Reserve Bank of Philadelphia.

Thomas J. Feeney, III, Kania, Lindner, Lasak & Feeney, Bala Cynwyd, Pa., for First Nat. Bank of Palm Beach Gardens.

Michael M. Mustokoff, Duane, Morris & Heckscher, Philadelphia, Pa., for Trust Co. of New Jersey.

Shaw, Goldman, Licitra, Levine & Weinberg, P.C., Garden City, N.Y. and Samuel Dennis, Philadelphia, Pa., for Community Nat. Bank and Trust Co. of New York.

Richard Z. Freeman, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Manufacturers Hanover Trust Co.

Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., for New Jersey Bank, N.A., Manufacturers Hanover Trust Co., Chase Manhattan Bank, Nat. State Bank of Elizabeth, Fidelity Union Bank, Valley Nat. Bank, Howard Sav. Bank, Meadowlands Nat. Bank, Citibank, N.A., Hudson City Sav. Bank, Midlantic Nat. Bank, Commercial Trust Co. of New Jersey, Washington Sav. Bank, First Nat. Bank of New Jersey, Edgewater Nat. Bank and Nat. Bank of North America.

## OPINION

LOUIS H. POLLAK, District Judge.

General Accident Insurance Company of America ("General Accident") brought this action against Fidelity and Deposit Company of Maryland ("Fidelity") seeking reimbursement under a blanket bond Fidelity had issued to General Accident. General Accident alleges that it lost over $2,000,000 as a result of a fraud perpetrated on it, in part, by some of its employees. The fraud alleged involved the issuance of drafts by General Accident without a proper basis—for example, for nonexistent claims, to nonexistent policyholders, or for excessive amounts. The drafts were negotiated at a number of different banks, passed through the chain of collection and reached First Pennsylvania Bank. Although the drafts were not drawn directly on an account at First Pennsylvania Bank, they were "payable through" that bank. First Pennsylvania Bank then obtained payment on those drafts from the drawee, General Accident.

Fidelity filed a third-party complaint against the banks allegedly involved in the collection process. The third-party complaint alleges that if Fidelity is liable to General Accident, Fidelity will be subrogated to General Accident's rights against these banks. Thus, the third-party complaint purports to assert, against the banks, those claims which General Accident could, itself, pursue against the banks in a direct action.

The banks have also filed cross-claims among themselves. In particular, First Pennsylvania Bank has filed cross-claims against the banks below it on the collection ladder.

As commonly occurs when a case reaches such substantial proportions—both in terms of number of parties and in terms of amount in dispute—a flurry of motions has been submitted seeking dismissal of these third-party claims. At the present time, the following motions have been fully briefed and await resolution.[1]

(1) The motion to dismiss Fidelity's third-party claims against New Jersey Bank, N.A., Manufacturers Hanover Trust Company, Chase Manhattan Bank, National State Bank of Elizabeth, Fidelity Union Bank, Valley National Bank, Howard Savings Bank, Meadowlands National Bank, Citibank, N.A., First National Bank of New Jersey, Hudson City Savings Bank, Midlantic National Bank, Edgewater National Bank, Commercial Trust Company of New Jersey, The National Bank of North America, and Washington Savings Bank. This motion has since been joined by First Pennsylvania Bank, N.A., First Jersey National Bank, Ramapo Bank, and the Federal Reserve Bank of Philadelphia.

(2) The motion to dismiss Fidelity's third-party claims against First Jersey National Bank. This motion has been joined by The Trust Company of New Jersey, First Pennsylvania Bank, and the Federal Reserve Bank of Philadelphia.

(3) The motion to dismiss Fidelity's third-party claims against Community National Bank and Trust Company which has been joined by The Trust Company of New Jersey and First Jersey National Bank.

(4) The motion to dismiss First Pennsylvania Bank's cross-claims against New Jersey Bank, N.A., Manufacturers Hanover Trust Company, Chase Manhattan Bank, National State Bank of Elizabeth, Fidelity Union Bank, Valley National Bank, and Howard Savings Bank. That motion has been joined by First Jersey National Bank, Ramapo Bank, and The Trust Company of New Jersey.

(5) The motion to dismiss First Pennsylvania Bank's cross-claims against First Jersey National Bank which has been joined by Community National Bank and Trust Company.

(6) The motion to dismiss First Pennsylvania Bank's cross-claims against The Trust Company of New Jersey.

(7) The motion to dismiss First Pennsylvania Bank's cross-claims against Community National Bank and Trust Company.

(8) The motion for summary judgment on Fidelity's claims filed by New Jersey Bank, N.A., Manufacturers Hanover Trust Company, Chase Manhattan Bank, National State Bank of Elizabeth, Fidelity Union Bank, Valley National Bank, Howard Savings Bank, Meadowlands National Bank, Citibank, N.A., First National Bank of New Jersey, Hudson City Savings Bank, Midlantic National Bank, Edgewater National Bank, Commercial Trust Company of New Jersey, The National Bank of North America, and Washington Savings Bank. That motion has been joined by Ramapo Bank.[2]

This list of parties and motions is deceptive in its length. The first three motions, although supported by ostensibly distinct briefs, raise identical legal arguments. In fact, the briefs submitted by First Jersey National Bank and Community National Bank and Trust Company are, for the most part, reproductions of the brief submitted

---

1. The motions for summary judgment filed by third-party defendants Hudson United Bank and the Federal Deposit Insurance Corporation will be dismissed as moot due to the stipulated dismissals of Hudson and FDIC.

2. On June 12, 1984, Fidelity filed what it entitles a "memorandum of law in opposition to First Jersey National Bank's motion for summary judgment." In that memorandum, Fidelity refers to two documents which were allegedly filed with this court on May 30, 1984 by third-party defendant First Jersey National Bank. Those documents were, according to Fidelity, a motion for leave to join in the motion of New Jersey Bank, N.A. for summary judgment and an independent motion for summary judgment.

It is unfortunate that Fidelity felt called on to go to the time and expense of preparing the June 12 memorandum in opposition to the First Jersey "motions." The Clerk of this Court has no record that such "motions" were ever filed.

by New Jersey Bank, N.A.[3] Furthermore, the motions to dismiss the cross-claims of First Pennsylvania Bank rely wholly upon the arguments presented in support of the motion to dismiss the third-party claims of Fidelity. Consequently, I will address the issues raised by all of these motions only once. Following the resolution of those issues, I will consider the arguments asserted in the motion for summary judgment filed by New Jersey Bank, N.A.

## I. MOTIONS TO DISMISS

Unfortunately, in their rush to move this litigation to prompt resolution, the parties have overlooked the substantial restrictions upon the court's authority to dismiss claims solely on the basis of the pleadings. As a result, most of the arguments raised in these motions suffer from the same defect—they seek a legal determination that Fidelity's claims are groundless although such a legal determination is impossible without further factual development.

### A. *Standard for Determination of a Motion to Dismiss*

Before I address the theories upon which these motions are based, it is appropriate to note the legal standard applicable to a motion to dismiss pursuant to Rule 12(b)(6).

[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Professors Wright and Miller, in their treatise on federal civil procedure, describe the analysis in similar terms.

The question therefore is whether in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief.

5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 at 601 (1969) (footnotes omitted).

Thus, the question before me is not whether Fidelity will prevail against the third-party defendants. That is a matter which is properly resolved upon the basis of proof, not merely upon the pleadings.

As a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief. In other words, dismissal is justified only when the allegations of the complaint itself clearly demonstrate that plaintiff does not have a claim....

The complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense, but the defense must

---

**3.** Most of the parties who joined in the various motions now before me did so through the filing of short documents which stated that one or more named parties wished to join in a motion previously submitted by another party for the reasons stated in that earlier submission. This is an acceptable practice in cases in which parties share common characteristics. To the extent that parties differ, and to the extent that these differences are relevant to the legal arguments presented by a motion, a party joining in that motion should inform the court of these differences.

Of much less value to the court, however, are submissions such as those by First Jersey National Bank and Community National Bank and Trust Company which duplicated, largely but not entirely, the previous submission of New Jersey, N.A. without apprising the court of the fact of this duplication. Reviewing the briefs side-by-side to identify those paragraphs and sections which were added to the original submission of New Jersey Bank, N.A. was a tedious and unproductive process which could have been avoided had the parties merely submitted briefs which stated that they adopted the arguments previously presented by others and then set forth additional arguments.

Furthermore, this court obtains no benefit from the mere retyping of substantial portions of briefs already before it. In particular, the briefs which not only repeated the text of prior submissions but also rearranged the citation forms from the earlier document were of no additional assistance to this court in resolving the legal issues before it and obviously required the expenditure of much time and effort which counsel surely could have applied to more important tasks.

Finally, the verbatim repetition of arguments in a reply brief which were already presented in the original memorandum in support of a motion is wholly unnecessary and inconsistent with the purpose of a reply brief.

clearly appear on the face of the pleading.

5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 at 604–06 (1969).

### B. *Items Considered on Motion to Dismiss*

The motions to dismiss assume that the allegations in both the complaint filed by General Accident against Fidelity and the third-party complaint filed by Fidelity against the banks should be considered in determining whether Fidelity's claims are viable. As a result, many of the arguments presented for dismissal of the third-party complaint rely upon "facts" presented in General Accident's complaint which, according to the third-party defendants, show that Fidelity's claims are legally unsupportable or are barred by certain affirmative defenses.

General Accident's complaint against Fidelity is appended to the third-party complaint. But that fact alone is not sufficient to tie Fidelity to the specific allegations made by General Accident. Nor does the fact that Fidelity's third-party claims are based upon its right to subrogation to General Accident's claims against the third-party defendants necessarily bind Fidelity to General Accident's pleadings. The allegations in the General Accident complaint are not proven facts by which all parties would be bound but merely General Accident's averments of its view of the circumstances surrounding this case. Third-party defendants have cited no authority for the proposition that Fidelity or any other party should necessarily be bound by the pleadings filed by another party over which it has no control.

 Of course, it is possible for one party to incorporate into its pleadings the pleadings of another party. Federal Rule of Civil Procedure 10(c) states:

Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

This language distinguishes between "pleadings" and "instruments." Instruments are documents which have some legal effect of their own. Pleadings, on the other hand, are not facts or even evidence of the existence of facts but are merely one party's allegations of fact. While instruments such as contracts, leases, bonds, and letters, when appended to a pleading become "a part thereof for all purposes" and, thus, may override a pleading if such instruments contradict that pleading, prior pleadings are treated quite differently. For all or part of a prior pleading to be incorporated in a later pleading, the later pleading must specifically identify which portions of the prior pleading are adopted therein. A party may not be deemed to have admitted the allegations of a prior pleading merely by attaching that pleading to his own. The later pleading must adopt specific portions or all of the earlier pleading "with a degree of clarity which enables the responding party to ascertain the nature and extent of the incorporation." *Heintz & Co. v. Provident Tradesmens Bank & Trust Company*, 29 F.R.D. 144 (E.D.Pa.1961) (attaching the original complaint to the third-party complaint did not incorporate the original complaint so as to prevent dismissal of the third-party complaint for failure to state a claim). Therefore, in ruling on the present motions to dismiss, I will determine the viability of Fidelity's claims solely by reference to the allegations of the third-party complaint and those portions of the original complaint which are specifically adopted by Fidelity's pleading.[4]

### C. *Choice of Law*

A further issue which is critical to a proper resolution of the motions to dismiss is, with regard to the state law claims

---

**4.** I will treat the exhibits to the complaint similarly to the complaint itself for purposes of determining which portions of those exhibits are incorporated in the third-party complaint. Only those portions of the exhibits to the complaint which are specifically relied upon in the third-party complaint will be considered part of Fidelity's allegations.

asserted, which state's law should apply. In the present case, the arguments for dismissal of the third-party complaint either assume that, no matter which state's law applies, the claims at issue must be dismissed, or assume that it is clear what state's law applies. The record currently before me does not support the latter assumption.

Apparently, the fraudulent scheme of which General Accident complains occurred primarily in New Jersey and Pennsylvania. The parties to this action include General Accident, a Pennsylvania corporation; Fidelity, a Maryland corporation; and a number of banks, many of which are incorporated under the federal banking laws but whose principal places of business include New Jersey, New York, Florida and Pennsylvania. Apart from these "facts," I have been provided with no information from which I can divine which states have a significant relationship to the issues in this dispute warranting the application of their substantive law. Under these circumstances, which state's law is applicable to a particular legal issue is not beyond dispute. Because, when faced with a motion to dismiss, I must resolve all doubts in favor of the non-moving party, unless it is clear that Fidelity's allegations could not state a valid claim under the laws of any of the potentially interested states, I cannot grant a motion to dismiss with regard to that claim.

### D. *Federal Rule of Civil Procedure 11*

Third-party defendants contend that the entire third-party complaint should be stricken for failure to comply with Federal Rule of Civil Procedure 11. That rule states, in pertinent part:

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal or existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction ...

Third-party defendants suggest that Fidelity has failed to satisfy Rule 11 because Fidelity is unwilling to adopt the allegations in General Accident's complaint as its own and apparently has no basis outside of General Accident's complaint for its claim against the third-party defendants. In addition, third-party defendants note that Fidelity appears to suggest in its third-party complaint that it does not intend to be bound by the allegations in that complaint. They contend that such a position clearly violates Rule 11's requirement that all pleadings be based upon "reasonable inquiry" and that they be "well grounded in fact."

■ Upon careful review of the third-party complaint, I conclude that Fidelity has satisfied both the letter and spirit of Rule 11. The third-party complaint states that the allegations contained therein are the result of a review of the original complaint and the attachments thereto as well as a series of discussions with officials at General Accident. Third-party complaint at ¶ 4. Thus, Fidelity has made some investigation of the facts supporting its claims against the banks and is not acting solely upon the information in the original complaint.

Although it might have been preferable for Fidelity to have conducted a more detailed, first-hand investigation of the facts surrounding the dispute before filing the third-party complaint, Fidelity was constrained both by Rule 11 and the local rules of this court which prescribe that a third-party complaint be filed within ninety days of the filing of the third-party plaintiff's answer to the original complaint. Rule 11 does not contemplate that a party will conduct such a thorough investigation that

discovery will be unnecessary. It is designed to deter the filing of claims and motions for which there is no basis in fact or law. *E.g., Schneider v. Austin,* 94 F.R.D. 44 (S.D.N.Y.1982). Under all of these circumstances, I cannot conclude that the extent of Fidelity's investigation of the facts supporting its third-party complaint was insufficient under Rule 11.

■ Furthermore, Fidelity's partial reliance upon material in the original complaint or in exhibits to that document does not require Fidelity to adopt the allegations of the original complaint in their entirety in order to satisfy the Federal Rules of Civil Procedure. Obviously, the allegations in the third-party complaint must state valid claims to withstand the present motions. However, Fidelity has not asserted that it is in some manner exempted from the general principle that all litigants are bound by their pleadings. Fidelity has merely averred that many of the allegations of the third-party complaint are based upon its "information and belief." Pleading on the basis of information and belief is generally permitted under the Federal Rules of Civil Procedure and

> is a practical necessity. How else can a pleader avoid the appearance of perjury when he is without direct personal knowledge regarding one or more of the allegations necessary to his claim and therefore must plead on less certain footing? Pleading on information and belief is a desirable and necessary expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of plaintiff but he has sufficient data to justify interposing an allegation on the subject.... The same is true whenever the pleader must rely on information furnished him by others.

5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1225 at 156 (1969). Thus, Fidelity's statement that it is pleading on the basis of information and belief is consistent with its previous statement that the knowledge which forms the basis for the third-party complaint is derived primar-

ily from discussions with personnel at General Accident. Consequently, there is no basis for the imposition of sanctions under Rule 11.

### E. *Fraud*

Certain third-party defendants named in the fraud and conspiracy counts of the third-party complaint—Counts V and VI—argue that the third-party complaint fails to plead the factual basis for these claims with the specificity called for by Federal Rule of Civil Procedure 9(b). Those counts of the third-party complaint allege that the so-called "Knowledgeable Banks"—First Jersey National Bank, Community National Bank and Trust, and The Trust Company of New Jersey—are liable to Fidelity (as the subrogee of General Accident) for fraud, deceit, conversion and bad faith and that these banks were parties to a conspiracy to defraud General Accident.

In particular, the third-party complaint states that authorized agents of these banks accepted the fraudulently obtained drafts, paid those drafts and presented the drafts to banks along the chain of collection for ultimate payment by General Accident. Fidelity alleges that those agents of the Knowledgeable Banks knew, at the time they received these drafts, that the drafts had been obtained by fraudulent means, or that the drafts were presented over fraudulent indorsements, or that the person presenting the drafts for payment did not have good title to the drafts. The drafts in question are identified in the third-party complaint as those listed in the Amended Proof of Loss which was attached as an exhibit to General Accident's complaint. Fidelity further alleges that the conspiracy and/or fraudulent scheme began in 1979 and the existence of this conspiracy is evidenced by the fact that many of the drafts presented to these banks for payment were presented by the same individual and that many drafts were approved for payment by the same bank officer.

Rule 9(b) of the Federal Rules of Civil Procedure states:

[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

To prove fraud, a party must establish the following: (1) that defendant made representations to him with regard to material facts; (2) that those representations were false; (3) that the defendant knew that the representations were false at the time they were made; (4) that the representations were made with the intent that they would be acted upon; (5) that the person to whom the representations were made reasonably believed that the representations were true; (6) that that person relied upon those representations to his detriment. In order to plead fraud with specificity, it is usually necessary to allege the time, place and content of the misrepresentations and damages.

However, it is not necessary to plead detailed evidentiary matter to make out a valid fraud claim. 2A *Moore's Federal Practice* ¶ 9.03 (1984). *See also id.* at ¶ 8.17[6] (notice pleading is all that is necessary for conspiracy claims). "All that is required is that the circumstances constituting the alleged fraud be pleaded with sufficient definiteness so as to advise the adversary of the claim which he must meet." *Cottman Transmission Systems, Inc. v. Dubinsky,* 95 F.R.D. 351, 352 (E.D.Pa. 1982). The specificity requirements of Rule 9(b) must be balanced against pleadings standard established in Rule 8 which directs that the pleadings present "a short and plain statement of the claim." Therefore, if the fraud allegedly involved a course of conduct over an extended period of time or a series of transactions, it is not necessary to recite, in detail, the facts of each transaction of the fraudulent scheme. *E.g., Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983).

Fidelity's third-party complaint fully satisfies these requirements. Although the allegations are based upon "information and belief," which is not generally specific

enough to satisfy Rule 9(b), such allegations are acceptable if the allegations are accompanied by a statement of the facts upon which the belief is founded. *Id.* at 482. The third-party complaint does this and presents quite detailed allegations of the circumstances surrounding the alleged fraud and conspiracy. Consequently, I will deny the third-party defendants' motion to dismiss to the extent that it relies upon Rule 9(b).

### F. *Statute of Limitations*

Third-party defendants also contend that many of Fidelity's claims are barred by the applicable statutes of limitations. They note that this court must apply the choice of law principles of the state in which it sits when considering state law claims. Pennsylvania has adopted a borrowing statute which states:

The period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim.

42 Pa.Cons.Stat.Ann. § 5521(b). Under this statute, third-party defendants argue, whether the negligence or conversion claims arose in Pennsylvania or New Jersey, those claims would be barred if outside of the shorter Pennsylvania statute of limitations of two years. 42 Pa.Cons.Stat.Ann. § 5524. *See* 2A N.J.Stat.Ann. 14–1 (six year statute of limitations). They also contend that the claims for breach of warranty are barred by 4–406 of the Uniform Commercial Code which has been adopted by both Pennsylvania and New Jersey. That provision reads, in pertinent part:

(a) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care

and promptness to examine the statement and items to discover his unauthorized signature or any alteration of any item and must notify the bank promptly after discovery thereof.

. . . .

. . . .

(d) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (a)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.

Third-party defendants assert that it is apparent from the face of the third-party complaint that any negligence or conversion occurred before 1981—two years before the 1983 filing of the third-party complaint. They also argue that it is obvious from the dates in the third-party complaint and the original complaint that the three-year time in which a customer must report unauthorized indorsements has elapsed with regard to all of the drafts in this case.

Fidelity responds that the third-party complaint presents no allegations from which such a legal conclusion can be drawn. In addition, Fidelity contends that the running of the statute of limitations in this action may be affected by the ongoing nature of the alleged torts, *e.g., Biglioli v. Durotest Corp.*, 44 N.J.Super. 93, 129 A.2d 727 (1957), *aff'd*, 26 N.J. 33, 138 A.2d 529 (1958); *Stuebig v. Hammel*, 446 F.Supp. 31

(M.D.Pa.1977), or the fraudulent concealment of the wrongs. *Swietlowich v. County of Bucks*, 610 F.2d 1157 (3d Cir.1979); *Hauptmann v. Wilentz*, 570 F.Supp. 351 (D.N.J.1983).

With regard to Fidelity's negligence and conversion claims, at this stage of the litigation, I can only dismiss these claims if it appears on the face of the complaint that these causes of action accrued outside of the applicable limitations period and that there is no basis on which Fidelity could suggest that the statute of limitations should have been tolled for a sufficient time to protect their claims. Thus, it is necessary to review the third-party complaint to decide whether it presents allegations from which I can determine the date on which the alleged negligence on the part of the various banks occurred.

For 4–406 to bar Fidelity's breach of warranty claims, I would need to determine that "statements" or "items" as defined by the Uniform Commercial Code covering the relevant drafts had been provided to General Accident more than three years prior to the filing of the third-party complaint. I would also have to find that all of the third-party breach of warranty claims involved the payment of drafts over forged indorsements.[5]

The third-party complaint states that the alleged conspiracy began in 1979. It also incorporates the list of drafts from the Amended Proof of Loss which was attached to the original complaint. That list contains the date on which each of the drafts was issued. No other dates are discussed in the third-party complaint.[6]

---

**5.** Of course, if the allegations clearly established that the drafts at issue were either paid over forged signatures or had been altered, then the relevant period under 4–406 would be only one year.

**6.** The original complaint alleges that between March 1979 and June 1981, General Accident "suffered a loss" as a result of an allegedly fraudulent scheme. This portion of the original complaint was not incorporated by reference into the third-party complaint. However, in their motions to dismiss, third-party defendants

contend that these allegations in the original complaint should bind Fidelity. Assuming *arguendo* that this allegation was a part of the third-party complaint, it would appear that third-party defendants' statute of limitations arguments would be no more successful. The allegation as presented in the original complaint does not define what events triggered a "loss" to General Accident. Thus, there is apparently no basis on which I could conclude as a matter of law that the events necessary to the accrual of the causes of action for negligence, or conversion clearly occurred during that time period.

■ There is no information in the complaint from which I can determine with certainty the time period in which the various drafts were presented to the third-party defendant banks for payment or the dates on which General Accident paid out on these drafts. Therefore, I have no basis for concluding that the alleged negligence or acts of conversion clearly occurred outside of the limitations period.

Furthermore, not only is there no mention in the pleadings of the dates on which General Accident received "statements" or "items" relating to the drafts at issue, there is nothing from which I can conclude that General Accident ever received such materials. Thus, I cannot reach the 4–406 argument raised by the third-party defendants.

Third-party defendants appear to argue that the relevant dates for the statutes of limitations can be inferred from the dates which are presented in the third-party complaint. However, it is my obligation to resolve all doubts in favor of the non-moving party when addressing a motion to dismiss. Accordingly, I cannot apply the assumptions or inferences which third-party defendants suggest and I must deny third-party defendants' motion to the extent that it rests upon this argument.

### G. Commercial Law Claims

### 1. Standing

Third-party defendants assert that Fidelity lacks standing to bring claims against them for breach of warranty under Uniform Commercial Code 4–207. The warranties created by that provision of the Code run from a "customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank" to "the payor bank or other payor who in good faith pays or accepts the item." 4–207(1). Third-party defendants claim that this language bars a breach of warranty claim by anyone other than a

payor *bank,* thus, precluding a claim by Fidelity or General Accident.

However, that provision expressly states that the warranties protect both a payor bank and any "other payor" ("who in good faith pays or accepts the items."). Thus, the question is whether General Accident, in whose shoes Fidelity purports to stand, qualifies as an "other payor" under 4–207.

■ The third-party complaint alleges that the drafts at issue were payable "by or through" First Pennsylvania Bank. Third-party complaint at ¶ 43. If the drafts at issue were "payable by" First Pennsylvania Bank only, then it would be the payor bank to which the warranties established by 4–207 would run. But if the drafts were merely "payable through" First Pennsylvania Bank and were ultimately payable by General Accident only, then First Pennsylvania Bank would be a "collecting bank" with regard to those drafts and would owe General Accident the same warranties as the other collecting banks. U.C.C. 3–120.[7] Under the latter circumstances, the drawee of the draft, General Accident, would also be the "other payor" to which the warranties of 4–207 would run. *E.g., Home Indemnity Co. v. First National Bank of Waukegan,* 659 F.2d 796, 798 n. 1 (7th Cir.1981); *Aetna Casualty & Surety Co. v. Traders National Bank & Trust Co.,* 514 S.W.2d 860 (Mo.App.1974). Because, on a motion to dismiss, I must view the allegations in the third-party complaint in the light most favorable to the pleader, I cannot conclude that Fidelity lacks standing to assert warranty claims against the third-party defendants under 4–207.

Extending their argument to face this possible basis for standing, the third-party defendants suggest that even if General Accident is an "other payor" for purposes of 4–207, public policy supports the dismissal of the conversion claims asserted in the third-party complaint. In support of this position, the third-party defendants cite *Brighton, Inc. v. Colonial First National*

---

**7.** Uniform Commercial Code 3–120 states:
An instrument which states that it is "payable through" a bank or the like designates that

bank as a collecting bank to make presentment *but does not of itself authorize the bank to pay the instrument.*

*Bank,* 176 N.J.Super. 101, 422 A.2d 433 (App.Div.1980), *aff'd,* 86 N.J. 259, 430 A.2d 902 (1981). *See Western Union Telegraph Co. v. Peoples National Bank in Lakewood,* 169 N.J.Super. 272, 404 A.2d 1178 (App.Div.1979). In that opinion, Judge Morgan of the Appellate Division of the New Jersey Superior Court concluded that a drawer of certain checks could not bring an action directly against banks in the chain of collection when the drawer was barred as a matter of law from suing the drawee—the payor bank. He noted that it would be inequitable to relieve from liability the drawee bank which dealt directly with the drawer and not the banks which had only an indirect relationship with the drawer of the checks. However, no such inequity exists in the present case. First Pennsylvania Bank, which presented the drafts to General Accident for payment, remains a party to this action. To date, no claims against that bank have been dismissed and the other third-party defendants do not suggest that there is any obvious legal basis for dismissing the claims against First Pennsylvania Bank which would not also result in dismissal of the claims against them. Thus, the potential inequity which concerned Judge Morgan is not present here.

Furthermore, to allow the claims against First Pennsylvania Bank to proceed at the same time as the claims against the banks lower on the collection ladder would vindicate the policy of avoiding circuity of actions reflected in the liberal joinder provisions of the Federal Rules of Civil Procedure. Although there may be little practical value to Fidelity's assertion of conversion as well as breach of warranty claims in this case, no strong policy arguments have been presented to support dismissal of the conversion claims at this early stage and I will allow them to remain.

■ Third-party defendants argue, in their reply brief, that public policy favors division of the claims in this case into two separate suits—one involving General Accident and/or Fidelity against First Pennsylvania Bank and a later, separate, action by either First Pennsylvania Bank, General Accident, and/or Fidelity against the other banks. But to require such separation of the claims would cause significant duplication of effort between the two suits. In addition, many claims might be barred or the ability to present them severely prejudiced by the passage of time before the first action is concluded and a claim could be presented against the collecting banks. In light of the fact that the third-party defendants have failed to suggest any distinctions between themselves and First Pennsylvania Bank which would warrant such an unusual procedure, I will not dismiss Fidelity's breach of warranty or conversion claims on this basis.

### 2. *Fictitious payee defense*

■ The motions to dismiss also attack the viability of the Uniform Commercial Code claims on the ground that the facts alleged show that all warranty claims are barred by the "fictitious payee defense." That defense is established in 3–405(1) of the Code.

An indorsement by a person in the name of a named payee is effective if:

(a) an imposter by use of the mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee;

(b) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument; or

(c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

This provision shifts the loss from certain types of forgeries to the party who issued the draft because, under the circumstances described in the three subsections of 3–405(1), the party issuing the draft is in a better position to recognize and avoid the forgery. J.J. White & R.S. Summers, *Uniform Commercial Code* § 16–8 (2d ed. 1980).

In support of this contention, third-party defendants point to the Amended Proof of Loss attached to the original complaint. That document recites General Accident's perception of how the fraudulent scheme which resulted in this action operated. It presents the following scenarios of the methods used:

legitimate claim files were assigned to a cooperative independent appraisal firm who would intentionally overstate the estimated cost of repairing the automobiles involved. Personnel within the company would not question the excessive payments. (The excess amounts presumably would be divided between the automobile body shops involved and the conspirators.)

information concerning fictitious events of loss would be provided by persons outside the company. This information could relate to policies on previously damaged, salvage or non-existent (other than legal title) vehicles, which policies were originated solely for the purpose of defrauding the company. The fictitious information could also relate to legitimate policyholders whose "involvement" was without their knowledge. In some cases policyholders who knowingly involved themselves submitted fictitious and legitimate claims.

utilization of legitimate claim files on which no payments had ever been made (so-called "closed without-payment" or CWP files). Such files are commonplace in an automobile damage claim unit and usually result from a policyholder's involvement in an accident which is not his fault. The insurance company of the at-fault person settles directly with our policyholder and no payment is made by us. Such files may contain many of the documents necessary to support a legitimate claim. Payments were issued to parties in such claims who never received the payments from GA.

instruction of a draft-typist to prepare and sign drafts without preparation of any file documents, supporting entries, reports, etc.

Amended Proof of Loss at 3.

Third-party defendants argue, first, that the drafts which were issued for amounts greater than the actual loss or for non-existent claims would not create breach of warranty liability on the part of the banks. They contend that because all of these drafts presumably would have been presented to the banks without material alterations, and with valid indorsements and signatures, there can be no basis for breach of warranty liability on the part of these banks.

Second, third-party defendants assert, those drafts which were presented to them with forged indorsements are the result of the type of conduct described in 3–405. In other words, those drafts were issued because an impostor induced General Accident to issue the draft to a nonexistent payee or because a General Accident employee provided General Accident with names of real policyholders but intended those drafts to come into the possession of himself and his co-conspirators. In either case, third-party defendants contend, the indorsements of the named payees on the drafts would be effective under 3–405 and the banks could not be held liable for the fact that the indorsements were not those of the actual payees.

Although it is possible that, when the facts surrounding this litigation are fully developed, third-party defendants will be able to establish that 3–405 precludes liability, I cannot so conclude on the basis of a motion to dismiss. The Amended Proof of Loss, like the original complaint, does not bind Fidelity for purposes of a motion to dismiss. These documents are only considered part of the allegations in the third-party complaint to the extent that they are incorporated by reference in that pleading. The third-party complaint does refer to the Amended Proof of Loss but solely in order to identify the particular drafts which were allegedly issued as part of the scheme. Fidelity's complaint also mentions General Accident's view of how the fraudulent

scheme operated. But the counts of the third-party complaint which allege conversion and breach of warranty base those claims solely upon the alleged acceptance of drafts by third-party defendants over forged indorsements. Drafts issued in amounts in excess of the actual claims or for nonexistent claims are not at issue in this case except to the extent that those drafts were also presented and paid over forged indorsements. Therefore, there is no need to dismiss claims for breach of warranty on the ground that some of the claims presented involve no forgery of indorsements.

Third-party defendants' assertions that they cannot be liable for accepting any of the drafts over forged indorsements because all of the drafts fall within the categories established in 3–405(1) fare no better. First, although our Court of Appeals has noted that the protections from liability embodied by 3–405(1) should be read relatively broadly to effect the purposes of that section, *New Amsterdam Casualty Company v. First Pennsylvania Banking & Trust Company*, 451 F.2d 892 (3d Cir. 1971), the particular facts surrounding the issuance and presentation of the drafts determine whether the transaction falls within the terms of 3–405(1) or not. For example, subsection (c) of 3–405(1) only makes a forged indorsement effective if the employee of the drawer of the draft "supplied" the name of the payee and "intend[ed] the latter to have no ... interest" in the draft. Also under subsection (a), it is necessary to determine whether the drawer of the draft was "induced" by an impostor to issue the draft. At the present stage of this action, the facts are not sufficiently developed to allow a definitive conclusion that the banks can bear no liability for acceptance of drafts over forged indorsements because

all drafts necessarily fall within one of the categories of 3–405(1).

Second, the third-party complaint states that some of the drafts in question had more than one indorsement. Thus, even if the indorsement of the payee is rendered effective under 3–405(1), abrogating liability on the part of the banks for breach of warranty with regard to that signature, I have no evidence that warranties regarding the other indorsements were not breached.

Third, the Uniform Commercial Code contains a general requirement of good faith on the part of all subject to it. Consequently, those courts addressing the issue consistently note that bad faith on the part of a bank precludes the imposition of the "fictitious payee defense" or creates liability notwithstanding the applicability of the "fictitious payee defense." *E.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank*, 57 N.Y.2d 439, 456 N.Y. S.2d 742, 442 N.E.2d 1253 (1982). Thus, at least with regard to those third-party defendants who allegedly defrauded General Accident, an unresolved issue of fact exists as to their good faith which precludes dismissal of the claims against them under the "fictitious payee defense." [8]

In addition, some courts have held that negligence alone on the part of a bank will not defeat the protection provided by 3–405(1). *E.g., Western Casualty & Surety Co. v. Citizens Bank of Las Cruces*, 676 F.2d 1344 (10th Cir.1982); *Prudential Insurance Company v. Marine National Exchange Bank*, 371 F.Supp. 1002 (E.D. Wis.1974); *General Accident Fire & Life Assurance Co. v. Citizens Fidelity Bank & Trust Co.*, 519 S.W.2d 817 (Ky.1975); *Brighton, Inc. v. Colonial First National Bank*, 176 N.J.Super. 101, 422 A.2d 433 (1980), *aff'd* 86 N.J. 259, 430 A.2d 902

**8.** Third-party defendants suggest that bad faith on the part of a bank would not defeat the "fictitious payee defense" but would create a separate cause of action for fraud against those banks. Although Fidelity has also stated a claim for fraud in this case against the Knowledgeable Banks, I have been presented no authority for the proposition that the narrowly-defined cause of action for fraud necessarily en-

compasses all conduct which could also meet the definition of bad faith. Furthermore, those courts which have addressed the issue have treated bad faith as a basis for liability directly under the Uniform Commercial Code and not as a separate common law claim. *E.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank*, 57 N.Y.2d 439, 456 N.Y.S.2d 742, 442 N.E.2d 1253 (1982).

(1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank,* 57 N.Y.2d 439, 456 N.Y.S.2d 742, 442 N.E.2d 1253 (1982); *New York City Board of Higher Education v. Bankers Trust Company,* 86 Misc.2d 560, 383 N.Y.S.2d 508 (1976). However, some commentators have argued that a failure to observe reasonable commercial standards should, alone, preclude the assertion of the "fictitious payee defense." J.J. White & R.S. Summers, *Uniform Commercial Code* § 16–8 (2d ed. 1980). Because the issues noted above make it impossible to determine whether the "fictitious payee defense" bars Fidelity's breach of warranty claims. I need not address the question whether negligence alone on the part of any of the third-party defendants would bar the "fictitious payee defense" in this case.[9]

■ The motions to dismiss also suggest that if the Uniform Commercial Code claims against third-party defendants cannot be dismissed at this time, the negligence claims in Count III should, in any event, be dismissed because the negligence of the banks could not override the "fictitious payee defense." But, as just discussed, the effect of the banks' negligence upon the "fictitious payee defense" is not a settled question in the courts of all of the states whose law is potentially applicable. Also, the negligence of a bank is relevant to the availability of other defenses to the breach of warranty claims under the Code. For example, the defenses in 3–406 and 4–406 are only available to banks which act in good faith and "in accordance with reasonable commercial standards."

Furthermore, 1–103 of the Code specifically preserves common law rights in addition to the rights created by the Uniform Commercial Code except to the extent that such common law claims are directly displaced by the Code. Whether a negligence claim is directly displaced by the Code in this case will turn, in part, upon the likely

applicability of the "fictitious payee defense" and a future determination of the effect of negligence upon the availability of that defense. *See Western Casualty & Surety Company v. Citizens Bank of Las Cruces,* 676 F.2d 1344 (10th Cir.1982). *See also Girard Bank v. Mount Holly State Bank,* 474 F.Supp. 1225 (D.N.J.1979) (the availability of a common law negligence claim depends upon the relationship between such a claim and the Code provisions applicable to the facts of the case). Thus, I will allow the negligence count to remain in the third-party complaint at this time.

### 3. *Other statutory arguments*

■ Mixed within the other, potentially more substantial, legal arguments for dismissal of the Uniform Commercial Code claims against them, third-party defendants suggest that 3–406 of the Uniform Commercial Code bars Fidelity's claims. 3–406 states:

> Any person who by his negligence substantially contributed to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the business of the drawee or payor.

Apart from the legal questions presented by this argument, such as whether a forged indorsement is equivalent to the making of an "unauthorized signature" under 3–406, there are clearly substantial open issues of fact which preclude me from resolving the motion on this ground. For example, although the third-party complaint indicates that some of General Accident's employees may have been a part of the fraudulent scheme which resulted in this litigation, I cannot make the quantum

---

**9.** In order to consider that issue, it will be necessary to determine which state's substantive law applies to those claims because only some state courts have resolved the issue in a definitive manner. As I noted earlier in this opinion,

I cannot make such a choice-of-law decision on the basis of the limited factual allegations and briefing of choice-of-law issues presented with these motions.

leap from that fact to the conclusion that General Accident was "negligent" and that such negligence "substantially contributed" to any alteration, false indorsement or other tampering with the proper negotiation of the drafts. In addition, this provision requires that the party asserting this defense have paid the instrument "in good faith" and "in accordance with the reasonable commercial standards of the business of the drawee or payor." The pleadings in this action do not provide any basis for determining whether such factors can be established in this case.

Similarly, I cannot conclude on the basis of the pleadings that the warranties created by 4–207 do not protect General Accident in this case. Third-party defendants suggest that the involvement of General Accident's employees in the fraud upon General Accident establishes that General Accident was, itself, not acting "in good faith." Thus, they conclude, since the warranties in 4–207 only run to a party who pays the draft "in good faith," General Accident may not state a claim under that provision. Obviously, the question whether the involvement of General Accident employees in the alleged scheme, if any, warrants the conclusion that General Accident, as an entity, did not pay the drafts "in good faith" is one which can only be resolved upon a substantial factual record and not merely on the basis of pleadings.[10]

### H. Equitable Considerations

Third-party defendants challenge all of Fidelity's claims on the ground that Fidelity's rights of subrogation to any claim which General Accident could have asserted are equitable rights. They note that a number of state courts require a party asserting rights of subrogation in cases such as this to justify his right to subrogation by establishing a "superior equity" as against the third-party defendant. E.g., United States Fidelity & Guaranty Co. v. First National Bank in Dallas, Texas, 172 F.2d 258 (5th Cir.1949); American Surety Co. v. Bank of California, 133 F.2d 160 (9th Cir.1943); Meyers v. Bank of America, N.T. & S.A., 11 Cal.2d 92, 77 P.2d 1084 (1938). Third-party defendants then argue that it is obvious from the face of the pleadings that the equities favor them over Fidelity, a surety for the company suffering the loss, and request that the third-party complaint be dismissed on that basis.

Fidelity responds to this argument by noting that none of the cases cited by third-party defendants was decided by courts of any state whose law is arguably applicable to this action. Although no Pennsylvania decisions are cited by either party, Fidelity cites to decisions in New Jersey and New York which state that a surety stands in

---

**10.** First Jersey National Bank's memorandum in support of its motion to dismiss contends that its justifiable reliance upon the intervening indorsements on the drafts presented to it precludes liability. If such a defense is available for any of the claims against First Jersey National Bank, the applicability of such a defense in this case plainly turns upon facts not before me at this time.

First Jersey National Bank also argues that it cannot be held liable for any of the conduct of its employees which is discussed in the third-party complaint because such conduct was not in furtherance of its business. Of course, in order to hold a corporation such as First Jersey National Bank legally responsible for the acts of its employees, there must be proof that those employees were acting in their capacities as employees of the corporation at the time of the alleged wrongdoing.

Paragraph 45 of the third-party complaint states:

Each of the third-party defendants identified in paragraphs 20 through 43 inclusive hereinabove, acted by and through its various officers, agents and employees who, for purposes of all acts by said third-party defendants set forth in this Third-Party Complaint, were at all relevant times acting on behalf of their respective employers and within the scope of their authority.

Thus, the pleading at issue in this motion alleges the necessary relationship between the employees who allegedly committed the wrongful acts and the corporations which Fidelity seeks to hold legally responsible. Because a motion to dismiss is only designed to test the sufficiency of pleadings and not a party's ability to establish the alleged facts at trial, I cannot go behind these allegations which are clearly sufficient to withstand the present motion.

the shoes of the party to whose rights it is subrogated unless it would be unconscionable to allow subrogation under the facts of that case. *E.g., Standard Accident Insurance Co. v. Pellecchia,* 15 N.J. 162, 104 A.2d 288 (1954); *National Surety Co. v. National City Bank,* 184 App.Div. 771, 172 N.Y.S. 413 (1918).

Under the latter standard, there is nothing in the pleadings which suggests that it would be unconscionable to allow Fidelity to claim subrogation rights against the third-party defendants. Moreover, assuming *arguendo* that the "superior equities" analysis relied upon by the third-party defendants is applicable to the present litigation, I cannot resolve such a fact-specific balancing question on the basis of the pleadings. In particular, the third-party defendant raising this argument in its brief in support of its motion to dismiss was First Jersey National Bank; one of the Knowledgeable Banks allegedly party to the fraud. If such involvement in the conspiracy can be established, a substantial argument could certainly be advanced that the equities favor the subrogee even under the "superior equity" analysis.

Furthermore, the briefs on both sides of this motion recognize that 3–405 of the Uniform Commercial Code may replace the "superior equity" analysis applied in the cases cited by third-party defendants. Many of those decisions involved situations in which the rights being asserted by the subrogated party were those of a corporation whose employees were responsible for the loss for which recovery was being sought. *E.g., United States Fidelity & Guaranty Co. v. First National Bank in Dallas, Texas,* 172 F.2d 258 (5th Cir.1949); *Meyers v. Bank of America, N.T. & S.A.,* 11 Cal.2d 92, 77 P.2d 1084 (1938); *New York Casualty Co. v. Sazenski,* 240 Minn. 202, 60 N.W.2d 368 (1953). But since these cases were decided, most states have enacted the Uniform Commercial Code or portions thereof. Thus, these courts did not have the advantage of a specific statutory provision allocating the responsibility for losses caused by faithless employees. Now that the legislatures have considered and

adopted a rule to apply to the faithless employee situation, the "superior equity" analysis of the past may be obsolete. However, I need not now decide whether this statutory provision has replaced the "superior equity" analysis, since it is not possible on the basis of the current record to resolve the issue under either analysis.

### I. *Rico Claims*

Count VII of the third-party complaint alleges that the Knowledgeable Banks—First Jersey National Bank, Community National Bank and Trust Company, and The Trust Company of New Jersey—acting through their employees, violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 to 1968 ("RICO"). RICO was enacted in 1970 as a tool for combatting the infiltration of organized criminals into legitimate businesses:

> RICO created an entirely new category of offenses. The statute makes collective, ongoing activity, of the sort commonly engaged in by "organized crime," an offense separate from the underlying violation.

*In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation,* 583 F.Supp. 1388, 1423 (E.D.Pa.1984).

> [RICO] makes it unlawful, *inter alia,* for any person to acquire or maintain any interest in or control of an "enterprise" through a "pattern of racketeering activity." 18 U.S.C. § 1962(b) (1982). RICO also makes it unlawful for any person employed by or associated with any enterprise to conduct the affairs of the enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c) (1982).
>
> An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." 18 U.S.C. § 1961(4) (1982). "Racketeering activity" is defined to include state law crimes such as murder, bribery, and ex-

tortion, and a specified list of federal crimes that includes mail fraud, 18 U.S.C. § 1341 (1982), wire fraud, *id.* § 1343 (1982), and interstate transportation and sale of stolen and fraudulently obtained goods, *id.* §§ 2314–2315 (1982). 18 U.S.C. § 1961(1) (1982). A "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5) (1982).

In brief, RICO makes it unlawful to acquire or maintain control of an enterprise—broadly defined to include virtually any *de facto* or *de jure* association—through a pattern of criminal activity, or to use such an enterprise to engage in a pattern of criminal activity. 18 U.S.C. § 1962(b), (c) (1982). It is also unlawful to conspire to perform these acts. 18 U.S.C. § 1962(d) (1982). While RICO is primarily a criminal statute, it also provides for civil remedies, including a cause of action for treble damages, available to "[a]ny person injured in his business or property by reason of a violation of section 1962...." 18 U.S.C. § 1964(d) (1982).

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786 at 788–789 (3d Cir.1984) (footnotes omitted).

The third-party complaint alleges that the Knowledgeable Banks were part of an enterprise which included organized criminals.

General Accident contends that certain of its employees were part of a scheme, enterprise and conspiracy involving elements of organized crime. The conspirators include, among others, certain independent automobile adjusting companies, banks, check-cashing services, other individuals and entities and the agents and employees of each of the foregoing. According to General Accident, the object of this scheme, enterprise and conspiracy was to siphon and convert General Accident's assets by among other things submitting false and/or fraudulent automobile accident claims to General Accident for payment.

Third-party complaint at ¶ 5. Later in the third-party complaint, the alleged enterprise is further described.

According to General Accident, the members of the criminal enterprise who allegedly conspired to, and did, defraud General Accident were part of an even larger enterprise and conspiracy that defrauded other insurance companies in New York and New Jersey, as well as General Accident, by use of a similar scheme. Members of the organization, enterprise and conspiracy which allegedly conspired to, and did, defraud General Accident, had numerous ongoing familial and business relations.

Third-party complaint at ¶ 9.

Fidelity alleges that, acting through and with this enterprise, the Knowledgeable Banks engaged in acts of mail fraud. Those acts were allegedly part of the scheme to defraud General Accident through the submission of false claims, inflated claims, etc. The success of the described scheme was, so it is alleged, made possible, in part, by the participation of such legitimate enterprises as the Knowledgeable Banks whose employees cashed the drafts fraudulently obtained and failed to inform General Accident of the existence of forged indorsements on those drafts.

In addition to these allegations of the existence and purposes of an "enterprise," Fidelity alleges a pattern of racketeering activity in which the Knowledgeable Banks allegedly participated. Individual acts of mail fraud during the time periods of the issuance of the drafts by General Accident are alleged to constitute the necessary two racketeering activities required to state a claim under RICO. Such criminal racketeering activities are also referred to as "predicate acts."

Fidelity alleges that the Knowledgeable Banks participated directly in the alleged enterprise. It also alleges that the Knowledgeable Banks "associated with" an enterprise in the conduct of the racketeering activity, thus violating subsection (c) of § 1962 of RICO. Finally, the third-party

complaint alleges that the Knowledgeable Banks "conspire[d] to violate" RICO in violation of subsection (d) of § 1962.

Third-party defendants challenge Count VII on three grounds. First, they contend that Fidelity failed to allege that the "enterprise" was distinct from the "pattern of racketeering activity." *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Second, they argue that corporations such as banks cannot be members of an enterprise comprised of "individuals associated in fact." Third, third-party defendants claim that the third-party complaint is defective in that it fails to allege an injury to third-party plaintiff distinct from the injury caused by the predicate acts of racketeering activity. I will consider each of these arguments in order.

1. *Enterprise distinct from pattern of racketeering activity*

In *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Court, speaking through Justice White, held that RICO was not solely designed to combat infiltration of legitimate enterprises by organized crime but could also be used to penalize wholly illegitimate enterprises. However, the Court concluded that it would be necessary for the Government to prove three elements to establish the existence of a criminal enterprise. Those elements are: (1) that there is an ongoing organization, formal or informal, (2) that the various associates making up the enterprise function as a continuing unit, and (3) that the enterprise exists separate and apart from the pattern of racketeering activity in which it engages. 452 U.S. at 583, 101 S.Ct. at 2528; *United States v. Riccobene*, 709 F.2d 214, 221 (3d Cir.1983), *cert. denied sub nom Ciancaglini v. United States*, —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). Third-party defendants' first argument in support of the motion to dismiss the RICO count is that this third element has not been properly alleged in the third-party complaint.

However, a review of the third-party complaint discloses that Fidelity has alleged that the enterprise is separate from the pattern of racketeering activity in which it allegedly engaged. The third-party complaint states that the enterprise is comprised of "certain independent automobile adjusting companies, banks, check-cashing services, other individuals and entities, and the agents and employees of each of the foregoing." Third-party complaint at ¶ 5. It also states that the enterprise involved elements of organized crime. *Id.* In addition, paragraph 9 of the third-party complaint alleges

> the members of the criminal enterprise who allegedly conspired to, and did, defraud General Accident were part of an even larger enterprise and conspiracy which formed an ongoing organization, enterprise and conspiracy that defrauded other insurance companies in New York and New Jersey, as well as General Accident, by use of a similar scheme. Members of the organization, enterprise and conspiracy which allegedly conspired to, and did, defraud General Accident, had numerous ongoing familial and business relations.

Thus, the third-party complaint satisfactorily alleges the existence of an enterprise which is distinct from the pattern of racketeering activity alleged.[11]

Moreover, our Court of Appeals has recently stated that the *Riccobene* and *Turkette* decisions speak only to what must be *proven* in a RICO action. Those decisions do not discuss what must be *pleaded* in order to state a cause of action under the civil liability sections of that statute. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (1984). Consequently, the court found that it was erroneous to apply the *Riccobene* analysis to the sufficiency of the allegations in a civil complaint. All that is neces-

---

**11.** A separate enterprise may be established even though "the proof used to establish [the existence of an enterprise and the pattern of racketeering activity] may in particular cases coalesce." *United States v. Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529.

sary is identification of the alleged enterprise sufficient to put the defendants on notice of the claims against them. *Id.* at 790. The third-party complaint in the present case clearly satisfies this requirement and therefore is not subject to dismissal.

### 2. *Corporation as part of enterprise*

The next argument in support of the motion to dismiss the RICO claim is that a corporation, such as a bank, may not be a "member" of an "individuals associated in fact" enterprise. RICO defines an enterprise as either a legal entity such as an association or corporation or a "union or group of individuals associated in fact although not a legal entity." § 1961(4).

Third-party defendants contend that the use of the term "individuals," rather than the term "person," which is defined as "any individual or entity capable of holding a legal or beneficial interest in property," § 1961(3), reflects an intention to limit the "individuals associated in fact" enterprise to groups of living persons. *United States v. Computer Sciences Corp.*, 511 F.Supp. 1125, 1131 (E.D.Va.1981), *rev'd on other grounds*, 689 F.2d 1181 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).

Such a narrow construction of the range of organizations subject to RICO's penalties is inconsistent with the broad language of the Act as well as its legislative history. An "enterprise" is defined in RICO as follows:

> "enterprise" *includes* any individual, partnership, corporation, any union or group of individuals associated in fact although not a legal entity.

§ 1961(4) (emphasis added). Thus, the terms of RICO suggest that the definition of "enterprise" is not strictly limited to only those organizations specifically listed in the definitional provisions of the Act. Furthermore, the House Report on RICO states that "infiltration of any associative group by any individual or group capable of holding a property interest can be reached" by the Act. House Rep. No. 91–

1549, 91st Cong.2d Sess. in 1970 U.S.Code Cong. & Admin.News 4007, at 4032. To read out of the coverage of the Act those associations which include corporations as members is inconsistent with this broad purpose. Thus, the interpretation contended for by third-party defendants is at odds with the purpose of the statute and not compelled by its language. *E.g., United States v. Thevis*, 665 F.2d 616 (5th Cir.), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *United States v. Huber*, 603 F.2d 387 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

▮ Even if the narrow definition of "enterprise" proposed by third-party defendants were appropriate, it would not be proper to grant the motion to dismiss the RICO count. RICO liability does not run directly against an enterprise but only against "persons." Fidelity's claims under RICO rest upon alleged violations of § 1962(c) and (d) by the Knowledgeable Banks. Those subsections make it unlawful for a "person" such as a corporation "employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," or to "conspire to violate" the other provisions of the Act. This language has been interpreted broadly to include both those inside and those outside the enterprise. *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *United States v. Forsythe*, 560 F.2d 1127 (3d Cir.1977). Thus, the Knowledgeable Banks may be held liable under RICO if they were "associated with" an enterprise even if they were not "members" of an "individuals associated in fact" enterprise.

### 3. *Racketeering enterprise injury*

Third-party defendants' final argument for dismissal of the RICO count is that the injury alleged by a civil RICO plaintiff must be different from or in addition to the injury one would suffer from the perpetration of the individual predicate acts of rack-

eteering activity. In support of this position, third-party defendants note that numerous courts have required pleading and proof of either a competitive injury or a "RICO-type" injury in a civil RICO case. *E.g., Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482 (2d Cir.1984) (must allege racketeering enterprise injury); *Bulk Oil (ZUG) A.G. v. Sun Company, Inc.,* 583 F.Supp. 1134 (S.D.N.Y.1983) (need injury from pattern of racketeering which violates RICO); *Bruns v. Ledbetter,* 583 F.Supp. 1050 (S.D. Cal.1984) (need racketeering enterprise injury); *Freschi v. Grand Coal Venture,* 583 F.Supp. 780 (S.D.N.Y.1984) (need racketeering enterprise injury); *Morosani v. First National Bank of Atlanta,* 581 F.Supp. 945 (N.D.Ga.1984) (injury must be of the type the statute was intended to prevent and must flow from the conduct which makes the defendant's actions unlawful); *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350 (S.D.N.Y.1984) (need racketeering enterprise injury which is different from the injury caused by the predicate acts); *Hudson v. LaRouche,* 579 F.Supp. 623 (S.D.N.Y.1983) (need racketeering enterprise injury); *Gitterman v. Vitoulis,* 579 F.Supp. 423 (S.D.N.Y.1983) (need racketeering enterprise injury); *Willamette Savings & Loan v. Blake & Neal Finance Co.,* 577 F.Supp. 1415 (D.Or.1984) (must allege racketeering enterprise injury); *Haroco v. American National Bank & Trust Co.,* 577 F.Supp. 111 (N.D.Ill.1983) (need injuries caused by the RICO violation, not merely the predicate acts); *Dakis on behalf of Dakis Pension Plan v. Chapman,* 574 F.Supp. 757 (N.D.Cal.1983) (must show either competitive injury or loss of control over a legitimate enterprise); *In re Action Industries Tender Offer,* 572 F.Supp. 846 (E.D.Va.1983) (need RICO type injury); *King v. Lasher,* 572 F.Supp. 1377 (S.D.N.Y.1983) (must plead racketeering injury); *Waste Recovery Corp. v. Mahler,* 566 F.Supp. 1466 (S.D.N.Y.1983) (need racketeering enterprise injury); *Noland v. Gurley,* 566 F.Supp. 210 (D.Colo.1983) (need injury of the type RICO was designed to prevent); *Bankers Trust Co. v. Feldesman,* 566 F.Supp. 1235 (S.D.N.Y.

1983) (need competitive injury caused by the racketeering scheme); *Barker v. Underwriters at Lloyd's London,* 564 F.Supp. 352 (E.D.Mich.1983) (need injury from RICO violation, not merely the predicate offense); *Windsor Associates, Inc. v. Greenfeld,* 564 F.Supp. 273 (D.Md.1983) (injury must stem from continuous racketeering); *Gitterman v. Vitoulis,* 564 F.Supp. 46 (S.D.N.Y.1982) (need racketeering enterprise injury); *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347 (S.D.N.Y.) (injury must arise from RICO violation), *aff'd,* 719 F.2d 5 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Johnsen v. Rogers,* 551 F.Supp. 281 (C.D. Cal.1982) (need racketeering enterprise injury); *North Barrington Development Inc. v. Fanslow,* 547 F.Supp. 207 (N.D.Ill. 1980) (need competitive and racketeering caused injury); *Harper v. New Japan Securities International, Inc.,* 545 F.Supp. 1002 (C.D.Cal.1982) (must show racketeering enterprise injury); *Van Schaick v. Church of Scientology, Inc.,* 535 F.Supp. 1125 (D.Mass.1982) (must allege competitive injury); *Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206 (E.D.Mich.1981) (must allege racketeering enterprise injury); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736 (N.D.Ill. 1981) (need more than injury from business fraud); *Erlbaum v. Erlbaum,* 1982 Fed. Sec.L.Rep. ¶ 98,772 (E.D.Pa.1982) (injury must arise from the illegitimate advantage defendant derives from racketeering).

These courts have based this limitation on the RICO civil damages remedy upon the language in § 1964(c) which allows a private action by a person "injured in his business or property by reason of a violation of section 1962." They note that RICO was modeled upon the Clayton Act which contains very strict standing requirements. Consequently, they propose that RICO should be read to require a "racketeering enterprise injury" just as the antitrust statutes require a "competitive injury." In other words, it is not sufficient to allege solely an injury caused by the predicate racketeering activities such as mail

fraud. A RICO civil plaintiff must establish that he suffered an additional injury of the type which RICO was designed to prevent.

In light of the vast expansion of the use of the RICO treble damages claim in all varieties of business litigation in recent years, a restriction such as this has been viewed as a check on the federalization of business fraud actions which is consistent with the language and intent of RICO. *See, e.g., Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482 (2d Cir.1984). However, the courts which have read RICO in this way have not made entirely clear the types of injuries which constitute "racketeering enterprise injuries." The most common definition of that term presented by these courts is an "injury of the type which the Act was designed to combat." *E.g., Id.; Alcorn County, Mississippi v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160 (5th Cir.1984); *Bruns v. Ledbetter,* 583 F.Supp. 1050 (S.D.Cal.1984); *Noland v. Gurley,* 566 F.Supp. 210 (D.Colo.1983); *Spencer Co. v. Agency Rent-A-Car Inc.,* 1981 Fed.Sec.L. Rep. ¶ 98,361 (D.Mass.). Those few which have attempted to provide more detailed definitions of the term often express quite different views as to its meaning. *E.g., Bulk Oil (ZUG) A.G. v. Sun Company, Inc.,* 583 F.Supp. 1134 (S.D.N.Y.1983) (injury must stem from the pattern of racketeering activity which violates § 1962); *Morosani v. First National Bank of Atlanta,* 581 F.Supp. 945 (N.D.Ga.1984) (injury must derive from the economic distortion which flows from an organization or its affairs being unlawfully manipulated or the enhancement of power which accrues to corrupt organizations); *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061 (S.D.N.Y.1983) (pervasive, ongoing and commercially debilitating conduct which causes injury must be shown); *Dakis on behalf of Dakis Pension Plan v. Chapman,* 574 F.Supp. 757 (N.D.Cal.1983) (must establish loss of control over an enterprise due to infiltration of the enterprise or due to competition from the enterprise); *Bankers Trust Co. v. Feldesman,* 566 F.Supp. 1235 (S.D.N.Y.1983) (competitive injury);

*Windsor Associates, Inc. v. Greenfeld,* 564 F.Supp. 273 (D.Md.1983) (injury from continuous racketeering); *Hunt International Resources Corp. v. Binstein,* 559 F.Supp. 601 (N.D.Tex.1982) (fraud must be linked to a racketeering influence infiltrating an enterprise); *Erlbaum v. Erlbaum,* 1982 Fed.Sec.L.Rep. ¶ 98,772 (E.D.Pa.1982) (injury must stem from defendant's illegitimate advantage derived from racketeering).

As a result of the difficulties encountered by those courts which have attempted to craft a limitation on the types of injuries which support a civil RICO claim and in light of the lack of any strong support for such limitations either on the face of the statute or in the legislative history, many courts have concluded that any person who has been injured by two predicate acts of racketeering activity may sue under RICO. *E.g., Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), cert. denied, —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation,* 583 F.Supp. 1388 (E.D.Pa.1984); *Laterza v. American Broadcasting Co.,* 581 F.Supp. 408 (S.D.N.Y.1984); *Yancoski v. E.F. Hutton,* 581 F.Supp. 88 (E.D.Pa.1983); *Swanson v. Wabash, Inc.,* 577 F.Supp. 1308 (N.D.Ill.1983); *Kirschner v. Cable/Tel Corp.,* 576 F.Supp. 234 (E.D.Pa.1983); *In re Longhorn Securities Litigation,* 573 F.Supp. 255 (W.D.Okl.1983); *Eisenberg v. Gagnon,* 564 F.Supp. 1347 (E.D.Pa.1983); *D'Irio v. Adonizio,* 554 F.Supp. 222 (M.D. Pa.1982); *Hanna Mining Co. v. Norcen Energy Resources Ltd.,* 1982 Fed.Sec.L. Rep. ¶ 98,742 (N.D.Ohio); *Ralston v. Capper,* 569 F.Supp. 1575 (E.D.Mich.1983); *Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231 (S.D.N.Y.1983); *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 567 F.Supp. 1146 (D.N.J.1983), *rev'd on other grounds,* 742 F.2d 786 (3d Cir.1984); *Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983); *Crocker National Bank v. Rockwell International Corp.,* 555 F.Supp. 47 (N.D.Cal. 1982); *Hellenic Lines, Ltd. v. O'Hearn,*

523 F.Supp. 244 (S.D.N.Y.1981). Judge Giles' comprehensive discussion of the arguments against such a limitation in *In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation*, 583 F.Supp. 1388 (E.D.Pa.1984), is particularly instructive.

■ Although I find the arguments against the imposition of a racketeering enterprise injury requirement quite compelling, it is not necessary for me to resolve the issue at this time. The third-party complaint alleges an injury to General Accident and, consequently, to Fidelity, which exceeds that resulting merely from individual acts of mail fraud. Fidelity alleges that the loss was the result of an ongoing, organized effort to defraud General Accident and other insurance companies. The success of this scheme and the ability of the enterprise to defraud General Accident of over two million dollars is, in large part, the result of the organized nature of the fraud. In enacting RICO, Congress was particularly concerned with the damage to the economy which results from the substantially increased power of criminals working in an organized structure. Both the nature and the magnitude of the fraud alleged in the third-party complaint result from the enhanced abilities of the organized criminal effort alleged. Thus, the third-party complaint alleges a racketeering enterprise injury in that it describes injuries to General Accident resulting from exactly the type of activity which RICO was designed to prevent. Accordingly, I will deny third-party defendants' motion to dismiss the RICO count as well.

### J. *Motions to Dismiss Cross-claims*

The motions to dismiss the cross-claims of First Pennsylvania Bank against various third-party defendants rest entirely upon the arguments asserted in the motions to dismiss the direct third-party claims in Fidelity's complaint. Because I conclude that I must deny the motions to dismiss the direct claims in their entirety, I will also deny the motions to dismiss the cross-claims.

### II. MOTION FOR SUMMARY JUDGMENT

The motion for summary judgment presents two groups of arguments. The first group of arguments depends upon affidavits submitted in support of the motion. The motion contends that the factual recitations in those affidavits establish that no genuine issues of material fact exist regarding the claims against the banks which have submitted the affidavits and that those banks are entitled to judgment as a matter of law. The second group of arguments asserts that Fidelity is not entitled to judgment against third-party defendants as a matter of law. I will consider each group of arguments separately.

Three third-party defendants—Edgewater National Bank, First National Bank of New Jersey, and The National Bank of North America (represented by its successor, National Westminster Bank)—have presented affidavits to show that the signatures on the drafts received by these banks were not forged and/or that certain drafts which were allegedly received by these banks never passed through their hands. Other third-party defendants—Washington Savings Bank and Commercial Trust Company of New Jersey—have filed similar affidavits; however, these affidavits do not discuss all of the drafts which were allegedly processed by those banks.

In its response to the motion for summary judgment, Fidelity states that it will dismiss all of its claims against the first three banks and will dismiss the claims against the latter two banks to the extent that those claims rely upon the drafts discussed in the affidavits. In the four months which have elapsed since the filing of this brief, Fidelity has not filed with this court any stipulations of dismissal of these parties. However, in light of Fidelity's representation that it plans to dismiss these parties and because no evidence has been presented in response to the movants' affidavits, I will grant these parties' motions.[12]

---

**12.** Fidelity's memorandum in response to the motion for summary judgment also states that

The only other banks to submit affidavits in support of the summary judgment motion are New Jersey Bank, N.A., Citibank, N.A. and Howard Savings Bank. The affidavit of New Jersey Bank, N.A. states that one of the drafts allegedly negotiated through that bank bears no indication of having been handled by New Jersey Bank, N.A. and there are no records of that bank having dealt with that draft. The affidavit of Citibank, N.A. describes the time frames in which drafts are usually transmitted from Citibank, N.A. to others in the collection process and states that two of the six drafts allegedly negotiated by Citibank, N.A. were probably presented to General Accident for payment on August 21 and December 17, 1980. The Howard Savings Bank affidavit refers to the signature cards of certain customers of that bank and states that the signatures on the three drafts allegedly negotiated by Howard Savings Bank were not forged.

 In response to these affidavits, Fidelity filed an affidavit of Stephen A. Ritt, Esq., one of the counsel for Fidelity. The affidavit describes a number of factual issues surrounding Fidelity's claims against these banks and states that Fidelity is awaiting responses to discovery requests which will allow it to respond adequately to the affidavits submitted by the banks. That affidavit is submitted pursuant to Federal Rule of Civil Procedure 56(f) which states:

> [s]hould it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affi-

davits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The affidavit appended to Fidelity's response is sufficient to support the conclusion that it would be better to allow the parties additional time for discovery than to rule on these motions on the basis of such limited factual submissions. Consequently, I will deny the motion for summary judgment insofar as it relies upon these three affidavits.[13]

The second group of arguments in support of the motion for summary judgment focuses upon the legal viability of the third-party complaint. The movants contend that Rule 14 does not allow the assertion of third-party claims such as the one presented by Fidelity and that the third-party claim in this case does not serve the purposes of Rule 14. In addition, they argue that even if Fidelity could present its claim as a third-party action, there is no set of facts under which General Accident could prevail against Fidelity and Fidelity could also prevail against the third-party defendants.

Rule 14 provides:

> At any time after commencement of the action, a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. . . .

In the present case, Fidelity has asserted its third-party claims under rights of subrogation and indemnification which it alleges it would have were General Accident to prevail in the original claim against Fidelity. Third-party defendants contend that

---

all claims against Midlantic National Bank will be dismissed. Because this bank did not present any evidence in support of the motion for summary judgment and because I conclude that the legal arguments asserted by all of the remaining banks in support of this motion are without merit, I cannot grant summary judgment in its favor. However, in light of Fidelity's representation in its memorandum, it is expected that a voluntary dismissal will be forthcoming.

**13.** Of course, if Fidelity determines in the course of discovery that there is no basis for assertion of claims relating to the drafts discussed in these affidavits or any other drafts at issue in this action, Fidelity should promptly submit appropriate voluntary dismissals of such claims.

this type of claim is not properly presented as a third-party action because Rule 14 only allows third-party claims against a person who is or may be liable to the third-party plaintiff. Third-party defendants suggest that this is in some manner distinguishable from a subrogation claim since a subrogation claim is actually the claim of the original plaintiff and not the claim of the third-party plaintiff. Thus, third-party defendants conclude, since the rules only allow a third-party plaintiff to assert his own claims, he cannot assert those of the original plaintiff—i.e., subrogation claims.

■ This argument is without merit. Rule 14 provides for third-party actions when third-party defendant is or *may be* liable to the third-party plaintiff. Fidelity's claims against the third-party defendant banks are based upon Fidelity's assertion that if it is found liable to General Accident under the fidelity bond, it would be legally subrogated to any rights which General Accident would have had against these third parties. *See Travelers Indemnity Co. v. First National State Bank of New Jersey,* 328 F.Supp. 208 (D.N.J.1971); *Standard Accident Insurance Co. v. Pellecchia,* 14 N.J. 162, 98 A.2d 706 (N.J.Super.1954); *In re General Indemnity Corp.,* 159 Misc. 892, 289 N.Y.S. 1046 (1936); *Martin v. National Surety Corp.,* 437 Pa. 159, 262 A.2d 672 (1970); Annot., 95 A.L.R. 269; 35 Am.Jur.2d *Fidelity Bonds* § 101; 35 P.L.E. *Subrogation* § 21 (1961). When a party is subrogated to the rights of another, the subrogated party is substituted for, or put in the place of, the party whose rights he is asserting. If Fidelity is subrogated to General Accident's rights against the third-party defendants, Fidelity would no longer be asserting General Accident's rights but would be asserting its own rights against those banks. Thus, Fidelity is not raising plaintiff's claims against the banks but is claiming that the third-party defendants may be liable to Fidelity and is properly presenting a third-party claim. *See 3 Moore's Federal Practice* ¶ 14.08 at 14–53 to 14–54 and ¶ 14.10 at 14.59 (1984) ("Another example is

impleader based upon subrogation where the liability of the third-party arises from the subrogation rights which the defendant acquires from the plaintiff."); 6 C.A. Wright & A.R. Miller, *Federal Practice & Procedure* § 1451 at 280 (1971) ("The contingent claim normally stems from the third-party plaintiff's right of indemnity, subrogation, contribution, or warranty.")

Third-party defendants also contend that the maintenance of a third-party claim in this action is contrary to the purposes of Rule 14 which are, according to third-party defendants, "to allow actions to be tried together where that would promote efficiency, save cost, and produce an outcome fair to all." Memorandum of Law at 10. The majority of the discussion in support of this argument reiterates the Rule 11 arguments made in the motion to dismiss. Since I have already addressed these contentions, I will not repeat my views on those issues. The remainder of third-party defendants' arguments on this point are that the third-party claim in this case substantially increases the number of parties and the issues before this court and has created the potential for inclusion of more parties.

■ Rule 14's primary purpose is the promotion of judicial efficiency through elimination of "circuity of actions," *Hanhauser v. United States,* 85 F.R.D. 89 (E.D.Pa.1979). The use of such third-party claims is designed to provide economies of time and expense by joining together suits revolving around a common factual setting, *Jones v. Waterman S.S. Corp.,* 155 F.2d 992 (3d Cir.1946), and to avoid the "potentially damaging time lag between a judgment against defendant in one action and a judgment in his favor against the party in a subsequent action." 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1442 at 203 (1971). The use of the third-party claim in the present action clearly obviates the circuity likely to occur if Fidelity were required to file a separate suit against those potentially liable to it should it become subrogated to General Accident's rights. Furthermore, if this second suit is

delayed until such time as Fidelity's rights of subrogation actually accrue, the statutes of limitation on Fidelity's claims as subrogee of General Accident's rights will be running against Fidelity and may expire. Finally, it is obvious that although the specific legal claims asserted by Fidelity and by General Accident are different, they revolve around the same facts and the evidence presented at a trial on General Accident's claims would substantially overlap that presented at a trial on Fidelity's third-party claims. Thus, I find no abuse of Rule 14.

The final argument asserted by third-party defendants in their motion for summary judgment is that there are no conceivable factual scenarios under which Fidelity could be held liable to General Accident and Fidelity could recover from third-party defendants. The banks note that the original claim by General Accident against Fidelity is for payment on a fidelity bond issued by Fidelity. They contend that to hold Fidelity liable to General Accident for payment on that bond, it is necessary to find that General Accident's employees were involved in the fraudulent scheme which led to the $2 million loss. Consequently, they argue, if Fidelity is found liable to General Accident and then seeks to assert its subrogation rights against the third-party defendants, it will be bound by the earlier finding that the agents or employees of the drawer of the drafts were the cause of the fraud. This, third-party defendants argue, in turn, necessitates the application of the "fictitious payee defense" to bar liability on the part of these banks. Assuming *arguendo* that the first proposition is correct—that Fidelity will only be held liable to General Accident if General Accident's employees were responsible for the loss—I cannot definitively conclude at the present time that such a finding compels the imposition of "fictitious payee defense." As explained earlier in this Opinion, the potential applicability of the "fictitious payee defense" to this action turns on a number of factual determinations which cannot be made at this time. For example, it is possible that some of the

drafts were issued for amounts in excess of the actual claims or for nonexistent claims and were negotiated over forged indorsements. Such drafts would not trigger application of the "fictitious payee defense," but if General Accident's employees were involved in obtaining these drafts, Fidelity might nonetheless be liable under the fidelity bond. Thus, I cannot conclude at the present time that there are no circumstances under which Fidelity would be liable to General Accident and could still present viable claims against the third-party defendants.

Accordingly, the motion for summary judgment is denied. An Order reflecting the foregoing rulings accompanies this Opinion.

### ORDER

For the reasons stated in the accompanying Opinion, it is hereby ORDERED that:

1. New Jersey Bank, N.A., et al.'s motion to dismiss the third-party complaint is DENIED.

2. First Jersey National Bank's motion to dismiss the third-party complaint is DENIED.

3. Community National Bank and Trust Company's motion to dismiss the third-party complaint is DENIED.

4. New Jersey Bank, N.A., et al.'s motion to dismiss the cross-claims filed by First Pennsylvania Bank is DENIED.

5. First Jersey National Bank's motion to dismiss the cross-claims filed by First Pennsylvania Bank is DENIED.

6. The Trust Company of New Jersey's motion to dismiss the cross-claims filed by First Pennsylvania Bank is DENIED.

7. Community National Bank and Trust Company's motion to dismiss the cross-claims filed by First Pennsylvania Bank is DENIED.

8. The motion for summary judgment of Edgewater National Bank, First National Bank of New Jersey and The National Bank of North America (represented by

**1250**

National Westminster Bank) is GRANTED. All third-party claims against those parties are DISMISSED.

9. The motion for summary judgment of Washington Savings Bank based upon Draft No. RH3695 and the motion for summary judgment of Commercial Trust Company of New Jersey based upon Draft No. RH400978 are GRANTED. The third-party claims against those parties based upon those drafts are DISMISSED.

10. The remainder of the motion for summary judgment of New Jersey Bank, N.A. et al. is DENIED.

11. Hudson United Bank's motion for summary judgment on the third-party complaint is DENIED as moot.

12. The Federal Deposit Insurance Corporation's motion for summary judgment on the third-party complaint and on the cross-claims of First Pennsylvania Bank is DENIED as moot.